# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

KYLE RYAN KURTZ,

Defendant-Appellant.

UNPUBLISHED
December 18, 2018

No. 340289
Macomb Circuit Court
LC No. 2016-000821-FH

Before: M. J. KELLY, P.J., and METER and O'BRIEN, JJ.

PER CURIAM.

In this case involving the Sex Offender Registration Act (SORA), MCL 28.721 *et seq.*, defendant, Kyle Kurtz, appeals as of right his jury trial conviction of failure to comply with SORA, MCL 28.729(1)(a). Because Kurtz's conviction was based on sufficient evidence and was not against the great weight of the evidence, we affirm.

## I. BASIC FACTS

In July 2014, Kurtz was convicted of aggravated indecent exposure, MCL 750.335a(2)(b). As a consequence of his conviction, he is required to register as a sex offender.[1] Initially, Kurtz registered his residence as being in Sterling Heights, Michigan. However, in April 2015, he updated his information, verifying that his address was in Eastpointe, Michigan.

In May 2015 and August 2015, the probation officer supervising his compliance with SORA made two scheduled visits to the Eastpointe address. Kurtz was present both times, as was his dog. The probation officer conducted a walkthrough inspection of the home on at least one of those dates. She testified that the house was sparsely furnished, and she noted the presence of a couch and a TV, but the absence of any personal belongings such as clothes, hats, shoes, and food on the counters. The probation officer also stated that although Kurtz had a dog, she did not observe a food bowl, water bowl, or dog toys. Additionally, after noting that the dog appeared to be a golden retriever or a yellow lab, she testified that she did not see any visible dog

---

[1] See MCL 28.723 and MCL 28.722(j) and (s)(*ii*).

-1-

hair.  The probation officer explained that it was unusual for a house to be so sparse and devoid of personal items, but at the time she took no further action.

On September 9, 2015, one of Kurtz's Eastpointe neighbors submitted a tip concerning him.  The neighbor testified that she had believed the house was vacant, but when she checked the sex offender registry she realized that Kurtz was supposedly living next door.  She stated that she called in the tip because she believed that he was using the address for registration, but was living somewhere else.  At trial, the neighbor explained that she was a stay-at-home mother and was also a smoker.  She stated that from where she smokes on her front porch,[2] she can see Kurtz's driveway and house.  She testified that in the months before she made her tip she never saw a vehicle in the driveway, did not see any people, and did not see any activity of any kind.  She also recounted an incident where her children threw a ball into Kurtz's backyard and then opened the gate to his backyard to retrieve it.  She explained that after a week the gate was still open.  The neighbor also testified at length about the accumulation of mail on Kurtz's porch.  She stated that it was coming out of the mailbox and that "porch" fliers were scattered all over the place.  She never saw anyone come to pick up the mail.

Based on the tip, the probation officer made an unscheduled visit to the Eastpointe address on September 2, 2015.  She stated that no one answered the door and Kurtz and his dog were not present.  Although she looked in the windows, she did not see any personal belongings or items for the dog.  She did, however, observe that the mailbox was full.  She then traveled to the Sterling Heights address that Kurtz had previously registered as his residence.  Although Kurtz was not present, she stated that there was a large dog barking inside.  When she looked through the colored windows she saw a dog that she believed was Kurtz's.

On September 3, 2015, a different agent went to the Sterling Heights address.  He testified that he also heard a dog barking, but stated that no one answered the door.  He photographed Kurtz's vehicle in the garage, however.  On September 4, 2015, Kurtz's probation officer made another visit to the Sterling Heights home.  She stated that she made contact with someone named Joe Fora, but Kurtz and his dog were not present.

The probation officer reported her suspicion that Kurtz was living at one address, but verifying at another to the Sterling Heights police department.  Subsequently, on October 7, 2015, the probation officer and a police officer went to the Sterling Heights address.  There was no vehicle present and no one answered the door.  Thereafter, the police officer called Kurtz's phone.  Kurtz reported to the officer that he was at a seminar for work and would be out of town until October 12, 2015.  Although the officer and Kurtz arranged to meet on October 12, 2015, Kurtz did not show up to the meeting.  In response to the officer's call about the missed meeting, Kurtz stated that the seminar was running long and he would be out of town for a few more days.  At trial, the officer stated that he told Kurtz he needed to discuss with Kurtz the details about where he was residing.  Kurtz told the officer that he would contact him once he was back in

---

[2] The neighbor explained that she would usually have her last cigarette of the day around 10 or 11 o'clock at night.

town, but he did not do so. The officer called Kurtz three more times, leaving a voicemail each time, but Kurtz did not return the calls.

While the officer was attempting to get in contact with Kurtz, the probation officer made another unscheduled visit to Kurtz's Eastpointe address on October 9, 2017. She stated that the situation was much the same as the previous unscheduled visit: no car, no dog, no answer at the door, and a full mailbox.

Kurtz's Eastpointe neighbor testified that a month or so after she called in the tip, she observed vehicles in Kurtz's driveway. She testified that it "looked like somebody was kind of moving in type of thing." She explained that she saw a couple of people, a couple of vehicles, and a cable-company vehicle. The neighbor also testified that she started hearing a big dog barking all the time. She added that she also saw Kurtz for the first time after she called in her tip.

In December 2015, Kurtz was arrested at the Eastpointe address for failing to comply with SORA. Following a jury trial, he was convicted of knowingly providing false information about where he was residing. This appeal follows.

## II. DIRECTED VERDICT

### A. STANDARD OF REVIEW

Kurtz argues that the trial court erred by denying his motion for a directed verdict because there was insufficient evidence to submit the charge to the jury. When reviewing a trial court's decision on a motion for a directed verdict, this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt. *People v Mayhew*, 236 Mich App 112, 124-125; 600 NW2d 370 (1999).

### B. ANALYSIS

MCL 28.727(6) provides that "[a]n individual shall not knowingly provide false or misleading information concerning a registration, notice, or verification." Under this provision, individuals registered as sex offenders must provide truthful and accurate information to the authorities regarding where they live. *People v Dowdy*, 489 Mich 373, 379-380; 802 NW2d 239 (2011). Thus, in order to sustain a conviction, the prosecution must establish beyond a reasonable doubt (1) the defendant was required to register as a sex offender, (2) the defendant provided misleading information concerning the registration, notice, or verification of his address, and (3) the defendant provided the false information willingly. Kurtz challenges the second and third elements.

Viewed in the light most favorable to the prosecution, there was sufficient evidence to support the elements. First, there was testimony that before the neighbor called in the tip, he was only seen at the house during scheduled visits from his probation officer. During those visits, the probation officer noted that the house was sparsely furnished and that there were no personal belongings present. She also noted the absence of food and water bowls for the dog, dog toys, or

dog hair. Second, the neighbor testified that in the months leading up to her tip, she believed the house to be vacant based on the absence of people, vehicles, and activities at the house. She recounted one incident where the gate to the yard was open for over a week after her children opened it. She noted that the mail was also overflowing and flyers were scattered on the porch. Third, the neighbor testified that a month or so after she reported the tip, she observed what she believed to be someone moving into the residence. The timing of this is significant as the police officer testified that he had notified Kurtz that he had questions about where Kurtz was residing. In any event, the neighbor testified that she now heard a bigger dog barking all the time and that she saw Kurtz for the first time. Overall, based on this evidence, the jury could infer that Kurtz verified the Eastpointe address as his home, but that he did not actually reside in the house until after he knew that he was being investigated regarding where he lived. And, as there is evidence that he was aware that he had to truthfully report where he lived, it is also reasonable to infer that when he registered the Eastpointe address as his residence in April 2015, he did so with the knowledge that he was not, in fact, actually going to reside there. Thus, viewing the evidence in the light most favorable to the jury, there was sufficient evidence to submit the charge to the jury and the trial court did not err by denying Kurtz's motion for a directed verdict.

III. GREAT WEIGHT OF THE EVIDENCE

A. STANDARD OF REVIEW

Kurtz next argues that his conviction was against the great weight of the evidence. Because he did not move for a new trial on this basis in the lower court, his claim is unpreserved and we review it for plain error. See *People v Musser*, 259 Mich App 215, 218; 673 NW2d 800 (2003).

B. ANALYSIS

"The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *Id*. at 218-219. "It is the province of the jury to determine questions of fact and assess the credibility of witnesses." *People v Lemmon*, 456 Mich 625, 637; 576 NW2d 129 (1998). "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Musser*, 259 Mich App at 219. Moreover, "unless it can be said that directly contradictory testimony was so far impeached that it was deprived of all probative value or that the jury could not believe it, or contradicted indisputable physical facts or defied physical realities, the trial court must defer to the jury's determination." *Id*.

Kurtz argues that he presented ample evidence that he actually resided in the Eastpointe residence during the pertinent timeframe, but his recitation of the evidence is merely a recitation of the evidence favorable to him. The jury was under no obligation to accept the testimony of the defense witnesses while rejecting that of the prosecution's witnesses. As explained in Section II(B) of this opinion, the prosecution presented sufficient evidence to show that the Eastpointe residence was not inhabited by Kurtz during the period in which Kurtz claimed that he resided there. The testimony of the prosecution's and defense's witnesses necessarily conflicts on the issue of whether defendant resided at the Eastpointe residence, and the testimony

of the prosecution's witnesses was not "so far impeached that it was deprived of all probative value or that the jury could not believe it." See *id.* Kurtz's conviction for failure to comply with SORA, therefore, was not against the great weight of the evidence.

Affirmed.

/s/ Michael J. Kelly
/s/ Patrick M. Meter
/s/ Colleen A. O'Brien